UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 Case |
|  | ) |  |
| LYONDELL CHEMICAL COMPANY, *et al.*, | ) | No. 09-10023 (REG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
| _____ ) | ) |  |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | Adversary Proceeding |
| v. | ) |  |
|  | ) | No. 11-1728 (REG) |
| UBS SECURITIES LLC, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
| _____ ) | ) |  |

<u>DECISION ON MOTION TO DISMISS</u>

APPEARANCES:

LACKEY HERSHMAN, LLP
*Attorneys for Plaintiff Highland Capital Management, L.P.*
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
By:    Deborah Deitsch-Perez, Esq. (argued)

SIMPSON, THACHER & BARTLETT, LLP
*Attorneys for Defendant UBS Securities LLC*
425 Lexington Avenue
New York, New York 10017
By:    Linda H. Martin, Esq. (argued)
       Anne L. Knight, Esq.
       Daniel Stujenske, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In this adversary proceeding under the umbrella of the jointly administered chapter 11 cases of reorganized debtor Lyondell Chemical Company ("**Lyondell**") and its affiliates, hedge fund Highland Capital Management, L.P. ("**Highland**") asserts claims against investment banker UBS Securities LLC ("**UBS**") for tortious interference with contract and with prospective economic relations for UBS' alleged wrongful conduct in denying Highland the opportunity to participate as a lender in Lyondell's exit financing.[1]  UBS moves to dismiss Highland's complaint (the "**Complaint**") under Fed.R.Civ.P. 12(b)(6) for failure to state claims upon which relief can be granted.

With respect to Highland's first claim for relief—for tortious interference with the alleged *existing* contract—UBS' motion is granted.  There was no contract with Highland as a party with which UBS tortiously interfered.

With respect to Highland's second claim for relief—for tortious interference with *prospective* contractual relations—one of UBS' two defenses requires consideration of matter that cannot yet be considered on a motion to dismiss.  But the other is not subject to those constraints.  The first of those two defenses—that UBS was acting to advance its economic interest in declining to enter into a transaction with Highland—requires further factual development, and cannot be considered on a motion under 12(b)(6).  But the second of them— that UBS was privileged in choosing not to do business with Highland, especially since Highland was an entity against whom UBS, in other litigation, made allegations of fraud, and Highland had also brought litigation against UBS—can be addressed with consideration of documents

---

[1]    Highland also seeks a declaratory judgment that Lyondell's confirmed plan of reorganization ("**Plan**") did not exculpate UBS' alleged tortious interference.  Since as discussed below, Highland's claims fail, as matters of law, in any event, this request is moot.

Highland had available to it and relied on when it crafted its Complaint, and matters of which this Court can take judicial notice.  Upon consideration of that additional matter, Highland's second claim for relief must be dismissed as well.

Facts

Under familiar principles, for the purpose of determining this motion to dismiss (and for that purpose only), the Court accepts the allegations of the 11-page Complaint as true, subject to the limits imposed under the Supreme Court's decisions in *Twombly* and *Iqbal*,[2] and other limits imposed by the Circuit when plaintiffs elect to characterize or disregard documents that bear on the viability of their claims.[3]  The allegations are summarized here.  Additional facts relevant to particular causes of action appear in the Discussion section that follows.

*1. Background*

In January 2009, Lyondell and its affiliates filed for protection under chapter 11 of the Bankruptcy Code in this Court.  As alleged in the Complaint, Highland was a long-time lender to and investor in Lyondell, with over $200 million invested in Lyondell across its capital structure.

*2. Communications to/from Highland*

Lyondell needed exit financing to emerge from bankruptcy.  In March 2010, Lyondell delivered a "Confidential Information Memorandum" (the "**Information Memorandum**") to Highland.  As alleged in the Complaint, the Information Memorandum "offered participation" in a $1 billion senior secured term loan facility (the "**Term Loan**") "on the terms memorialized" in

---

[2]     *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("***Twombly***"); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("***Iqbal***").

[3]     *See* pages 10-11 below.

the Information Memorandum.[4]  UBS was "Lyondell's New York agent arranging" the Term

Loan.[5]

As alleged in the Complaint, the Information Memorandum "outlined the material terms"

of the Term Loan, and "specified the manner in which Lyondell's offer could be accepted." [6]

Specifically, the Information Memorandum included a form letter that interested recipients were

instructed to transmit back to Lyondell's agent UBS, stating in pertinent part:  "Subject only to

satisfactory documentation, we are pleased to commit:  $___ million to the $1.0 billion Senior

Secured Term Loan Facility."[7]  Parties seeking to participate were instructed to fill in the amount

of the $1 billion Term Loan to which they would commit.

As recognized in the Complaint, "[t]he form letter referred to UBS and Lyondell's

discretion to make 'allocations' of the Term Loan." [8]  But as further alleged in the Complaint,

"[a]s typically used and understood in the industry, such discretion must be exercised in good

faith and exists to enable the borrower to provide pro-rata allocations when an offering is

oversubscribed."[9]

On March 15, 2010, Highland received the "offer made in the [Information]

Memorandum."[10]  On March 17, 2010, as alleged in the Complaint, Highland "issued a

---

[4]      ECF #1 Cmplt. ¶ 8.

[5]      *Id.* ¶ 1.

[6]      *Id.* ¶¶ 11-12.  Many of the facts alleged by Highland are conclusory, represent legal conclusions, or both,
         and under *Twombly* and *Iqbal* are not entitled to the deference that courts give to underlying facts.  To lay
         out Highland's position as to the facts, the Court includes all of Highland's material allegations here, noting
         those that are not entitled to deference—in part in the Court's discussion of the facts and in part in the
         Discussion that follows.  Among the several legal conclusions that are not entitled to deference is
         Highland's (also conclusory) allegation that the Information Memorandum was an offer.

[7]      *Id.* ¶ 12.

[8]      *Id.* ¶ 14.

[9]      *Id.*

[10]     *Id.* ¶ 15.  However, the characterization of the Information Memorandum as an offer is once more
         conclusory and a legal conclusion.  *See* n.6 above.

commitment letter" (which Highland defined as the "**Commitment Letter**") "in the form requested by Lyondell."[11]  Specifically, the Commitment Letter stated, in pertinent part, that "[s]ubject only to satisfactory documentation, on behalf of our advised funds and accounts we are pleased to commit:  $150 million to the $1.0 billion Senior Secured Term Loan Facility."[12]

On the same date, as alleged in the Complaint, Lyondell "accepted the commitment,"[13] stating (in an e-mail) (the "**Responsive E-mail**") "Thank you very much, we look forward to successfully close [sic] this financing."[14]

On March 25, 2010, Lyondell provided notice of revised pricing terms.  "Accordingly," as alleged in the Complaint, Lyondell requested that Highland "recommit" to the revised pricing, on or before March 26, 2010.[15]  On March 25, 2010, Highland "sent the requested notice re-confirming its commitment to loan $150 million, "as previously agreed."[16]

*3.  UBS and Its Alleged Wrongful Conduct*

As further alleged in the Complaint, UBS "was operating ostensibly as Lyondell's agent."[17]  UBS and Bank of America Securities, LLC ("**BofA**") were designated the Joint Lead Arrangers and Joint Bookrunners of the Term Loan, and UBS and BofA prepared and delivered the Information Memorandum to Highland.  As alleged in the Complaint, "UBS was also the party designated to receive acceptance letters, such as the Commitment Letter sent by

---

[11]  *Id.* ¶ 16.

[12]  *Id.*.

[13]  *Id.* ¶ 17.  Once more, the Court sees allegations that are conclusory and contentions of law.

[14]  *Id.*

[15]  *Id.* ¶ 18.

[16]  *Id.* ¶ 19.  And once again, the Court sees allegations that are conclusory and conclusions of law.

[17]  *Id.* ¶ 22.

Highland."[18]  Then, as alleged by Highland, "UBS was the party charged with exercising

Lyondell's discretion in determining allocations of the Term Loan."[19]

Highland then alleges that UBS, at the same time it was charged with arranging

Lyondell's financing, "was involved in its own unrelated dispute with Highland."[20]  Then, as

alleged in the Complaint:

> In order to pressure Highland in its own personal dispute,
> UBS willfully and in bad faith refused to allow Lyondell to
> allocate to Highland its agreed share of the Term Loan.
> Rather, UBS, in an attempt to show Highland who was
> boss, so to speak, abused its position of trust with Lyondell
> to exercise pressure on Highland. [21]

Highland further alleges that UBS sought to "maliciously punish Highland for exercising

its rights in the UBS/Highland dispute, by withholding from Highland a valuable opportunity,"

and that:

> UBS intended that disabling Highland from obtaining a part
> of the Lyondell Term Loan would embarrass Highland and
> diminish its standing in the financial community, would
> harm Highland's own fund-raising efforts and ultimately
> deprive Highland of the profit to be made from the
> extremely successful Lyondell offering.[22]

Finally, Highland alleges that by March 30, 2010, it learned that the loan allocations had

been made and that it apparently had not received any part of the Term Loan allocation.[23]

---

[18]     *Id.*

[19]     *Id.*

[20]     *Id.* ¶ 23.

[21]     *Id.* ¶ 24.  Later in the Complaint, Highland alleges an evidentiary fact, as contrasted to one of the elements
of its claim—that "UBS brazenly admitted that it refused to provide any allocation to Highland because of
the UBS/Highland litigation."  *Id.* ¶ 28.

[22]     *Id.* ¶¶ 25-26.

[23]     *Id.* ¶ 27.

### 4.  Claims for Relief

Based on these underlying facts, Highland seeks compensatory damages for tortious interference with (1) an allegedly existing contract, and (2) prospective contractual relations.[24]

Highland also seeks punitive damages on each of these claims.

### 5.  Procedural History

The Court first became aware of Highland's grievances in August 2010 when Lyondell filed a motion in its umbrella chapter 11 case to address a lawsuit brought by Highland in New York state court—then against both UBS and Lyondell—similarly complaining of Highland's allegedly wrongful exclusion from the opportunity to provide financing to Lyondell.  In a motion to enforce provisions of the Plan (the "**Plan Enforcement Motion**"), Lyondell argued in the Plan Enforcement Motion, in contentions with which the Court ultimately agreed, that this Court had exclusive jurisdiction over the claims Highland had asserted, and that Highland's claims, insofar as they were asserted against Lyondell, were discharged.[25]

In arguing against the Plan Enforcement Motion, Highland referenced, and filed with the Court, documents relating to the alleged contract with which Highland now asserts that UBS tortiously interfered.[26]  They included:

(1) the Information Memorandum;

---

[24]  As noted above, *see* n.1, Highland also seeks a declaratory judgment that Lyondell's Plan does not exculpate UBS' alleged tortious interference.  This third prayer for relief is not, however, a separate claim for damages, but rather is an effort to cut off a defense that UBS might otherwise assert to Highland's compensatory and punitive damages claims.

[25]  *See In re Lyondell Chemical Co.*, 445 B.R. 277 (Bankr. S.D.N.Y. 2011) (the "***Plan Enforcement Decision***").  UBS, which joined in Lyondell's motion, also argued that exculpation and "good faith" findings in the Court's confirmation order barred Highland's claims as a matter of law.  In those respects, the Court concluded that the "good faith" findings related to something else, and that it was premature to determine whether the exculpation provisions would apply.  *See id.* at 292-95.

[26]  *See* Nov. 23, 2010 Hrg. Tr. (filed at Adv. Pro. 09-1726 ECF #27) ("**Plan Enforcement Motion Hrg. Tr.**") at 38.

-6-

(2) a term sheet attached to the Information Memorandum (the "**Terms Summary**");

(3) email communications among Highland, Lyondell, and UBS in March 2010 (the "**March 2010 Emails**"); and

(4) an execution copy of the ultimate Term Loan Agreement, dated as of April 8, 2010 (the "**Term Loan Agreement**"), about three weeks after the communications on which Highland bases its claims.[27]

*6. Other Matters That the Court May Consider*

For reasons discussed below, the Court may consider other documents, which Highland elected not to reference expressly in its Complaint, but which Highland relied upon, characterized, or otherwise made reference to in its presentations to the Court, or as to which the Court may take judicial notice.

One such document was the Engagement Letter, which among other things described the nature of UBS' agency, which was characterized by Highland at paragraph 22 of its Complaint.[28] The Engagement Letter provided, in relevant part:

> The Joint Lead Arrangers, in consultation and cooperation with [Lyondell], will manage all aspects of any syndication, including decisions as to . . . which institutions will participate . . . .[29]

Other documents that the Court properly may consider, by taking judicial notice of them, are two state court complaints filed by UBS in litigation against Highland:  *UBS Securities LLC v. Highland Capital Management, L.P.*, Index No. 650097/2009, and *UBS Securities LLC and*

---

[27] *See* Adv. Pro. 11-1728 ECF ## 9 ("**12(b)(6) Motion**"), 17; *see also* Umbrella Case ECF #4170.

[28] At oral argument on this motion, Highland stated that it did in fact rely upon the Engagement Letter when drafting the Complaint.  *See* Hrg. Tr. at 13:7-21.

[29] 12(b)(6) Motion Exh. B, at  4.

*UBS AG, London Branch v. Highland Capital Management, L.P.*, Index No. 65072/2010, respectively.[30]   In these actions, which were filed in 2009 and 2010, respectively, UBS charged Highland with alleged fraudulent conduct in connection with the 2008 restructuring of a collateralized loan obligation facility.[31]   The Court can likewise take judicial notice of the existence of litigation UBS brought in New York state court against Highland, in August 2008 and February 2010, respectively,[32] and Highland brought against UBS in Texas,[33] all prior to Highland's commencement of its New York state court suit against Lyondell and UBS.

Discussion

I.

Preliminary Matters

A.  *Standards for Application of Rule 12(b)(6)*

Under Fed.R.Civ.P. 12(b)(6), made applicable in adversary proceedings like this one under Fed.R.Bankr.P. 7012, a party may move to dismiss on the ground that the opposing party's complaint "fail[s] to state a claim upon which relief can be granted."

The standards for deciding such a motion are well established.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[34]   A court's function on a motion to dismiss is "not to weigh

---

[30]     12(b)(6) Motion Exh. E.

[31]     The Court takes judicial notice of the existence of these suits; that UBS brought them against Highland in 2009 and 2010, before the events at issue here; and that UBS made the allegations it did.  The Court does not, of course, make any findings as to the merits of UBS' allegations in those suits.

[32]     *SPCP Group, LLC v. UBS AG*, Index No. 602418/2008 (in which Highland is a third-party defendant), and *UBS AG v. Highland Capital Management L.P.,* Index No. 650094/2010; *see* 12(b)(6) Motion Exh. F, Exh. G.

[33]     *Highland Credit Opportunities CDO, L.P. v. UBS AG,* Case No. DC-10-16004; *see* 12(b)(6) Motion Exh. H.

[34]     *Iqbal*, 556 U.S. at 678 (citations and internal quotation marks omitted); *accord Twombly*, 550 U.S. at 570.

the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient."[35]

In *Iqbal*, the Supreme Court, building and expanding on *Twombly*, outlined a two-step approach in deciding a motion to dismiss.[36]  First, a court should begin by "identifying pleadings that, because they are no more than [legal] conclusions, are not entitled to the assumption of the truth."[37]  (A plaintiff's obligation to provide the grounds for his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.")[38]  Second, a court must accept all well-pleaded factual allegations in the complaint as true, draw all reasonable inferences in the plaintiff's favor,[39] and determine whether the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face."[40]  "A claim has facial plausibility," the Supreme Court has explained:

> when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.[41]

---

[35]     *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

[36]     *In re M. Fabrikant & Sons, Inc.*, 447 B.R. 170, 185 (Bankr. S.D.N.Y. 2011) (Bernstein, J.) (citing *Fowler v. U.P.M.C. Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)).

[37]     *Iqbal*, 556 U.S. at 679; *see also id.* at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions.").

[38]     *Twombly*, 550 U.S. at 554.

[39]     *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

[40]     *Twombly*, 550 U.S. at 570.

[41]     *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556-57) (internal quotation marks omitted).

Defendants may raise affirmative defenses on a motion to dismiss. But a complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense only if the defense appears on the face of the complaint.[42]

In that connection, however, a complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."[43] And the Court may also consider, on a motion to dismiss (and without converting the motion to one for summary judgment) "documents attached to the complaint as an exhibit or incorporated in it by reference, ... matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit"[44]— though with respect to a document in a plaintiff's possession or as to which it has knowledge, only so long as the plaintiff relied on any such document in drafting the complaint,[45] or knowingly chose to characterize the document, without attaching it, in a manner to its liking.[46]

Then if allegations of a complaint are contradicted by documents that are part of the complaint, the document, and not the allegations, controls, and the court need not accept such

---

[42]  *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003); *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 406 n.5 (S.D.N.Y. 2009) ("***IMG Fragrance***").

[43]  *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("***Cortec***").

[44]  *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir. 1993) ("***Brass***") (dicta); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("***Chambers***") (citing *Brass,* but describing it as dicta, and clarifying the applicable rule); *see* n.45 below.

[45]  *Chambers,* 282 F.3d at 153 & n.3 ("Because this standard has been misinterpreted on occasion, we reiterate here that a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough.") (emphasis in original).

[46]  *Chambers,* 282 F.3d at 153 ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.") (quoting *International Audiotext Network, Inc. v. American Telephone & Telegraph Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("***International Audiotext***") (per curiam)).

allegations as true.[47]  And plaintiffs cannot willfully close their eyes to documents in their

possession that are integral to their claims.[48]

## B.  Choice of Law

The parties agree that New York law applies to Highland's state law claims.

## C.  Documents Appropriately Considered on this Motion to Dismiss

As discussed above, Lyondell filed a motion in its umbrella case, in August 2010, to

address an earlier lawsuit brought by Highland in New York state court—then against both UBS

and Lyondell—similarly complaining of Highland's allegedly wrongful exclusion from the

opportunity to provide financing to Lyondell.  As also discussed above, in arguing against the

motion, Highland referenced, and filed with the Court, documents relating to the alleged contract

with which Highland now asserts that UBS tortiously interfered.[49]  They included (1) the

---

[47]    *See Barnum v. Millbrook*, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994) (Sweet, J.), *aff'd without opinion*,
43 F.3d 1458 (2d Cir. 1994); *Poindexter v. EMI Record Group Inc*., 2012 U.S. Dist. LEXIS 42174, at *6,
2012 WL 1027639, at *2 (S.D.N.Y. 2012) (Swain, J.).

[48]    In its 2002 decision in *Chambers*, the Circuit cut back on earlier, broader, pronouncements in *Cortec*,
*Brass*, and *International Audiotext* in the 1990s in which the Circuit had stated, in substance, that trial
courts could consider, on motions to dismiss, documents that plaintiffs had in their possession or knew
about that would defeat their claims.  In *Cortec*, for example, on appeal from a dismissal of a complaint on
a 12(b)(6) motion, and considering "what documents a district judge may consider when disposing of a
motion to dismiss a complaint for failure to state a claim" when the plaintiffs "*insisted the district court not
consider them*" (emphasis added), the Circuit determined that the district court was correct when it declined
to disregard them.  *See* 949 F.2d at 44.  But the *Chambers* court did not say that it was overruling *Cortec*,
and this Court does not understand the *Chambers* court to have overruled the *Cortec* court's statement that
"[p]laintiffs' failure to include matters of which as pleaders they had notice and which were integral to their
claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the
district court's decision on the motion."  *Id.*

The Court synthesizes the arguably clashing rulings in *Chambers*, on the one hand, and *Cortec*, *Brass*, and
*International Audiotext*, on the other, to lay out a principle that as a general matter, extrinsic matter should
not be considered on a motion to dismiss, even when a plaintiff is on notice of it before the plaintiff's
complaint has been filed.  But if the plaintiff purports to characterize the extrinsic matter in its complaint,
or knows about it and intentionally chooses to disregard it, a moving defendant still may rely on that
extrinsic matter in moving to dismiss, and the Court need not subject that defendant, and the Court system,
to the additional expense and burden of considering that same matter later on a motion for summary
judgment.

[49]    *See* Plan Enforcement Motion Hrg. Tr. at 38.

Information Memorandum; (2) the Terms Summary; (3) the March 2010 Emails; and (4) the

Term Loan Agreement.

This adversary proceeding was commenced on April 11, 2011.  Under these

circumstances, Highland knew of, and necessarily had before it, those documents when drafting

the Complaint.[50]

Likewise, as described above, the Court can consider the Engagement Letter, and the

state court complaints evidencing the litigation between Highland and UBS preceding the alleged

wrongful conduct by UBS that is the subject of the Complaint.

## II.

### Merits of the Claims

A.    *Interference with Contract*

Under New York law, a claim for tortious interference with contract requires "the

existence of a valid contract between plaintiff and a third party, defendant's knowledge of the

contract, defendant's intentional procurement of the third-party's breach of the contract without

justification, actual breach of the contract, and damages resulting therefrom."[51]  Relying

principally on the first of those several requirements, UBS argues that this claim must fail,

because there was no contract between Highland and Lyondell.  The Court agrees.

To form an enforceable contract under New York law, "there must be an offer,

acceptance, and consideration, as well as a showing of a meeting of the minds, demonstrating the

---

[50]    While similar principles permit the Court to consider the Term Loan Agreement, the provisions of the Term
Loan Agreement are not relevant here.  *See Plan Enforcement Motion Decision.*, 445 B.R. at 286
("Highland is not seeking to enforce the Term Loan Agreement.  It couldn't do so.  Highland never entered
into and was not a party to the Term Loan Agreement.  In fact, its *exclusion* from the Term Loan and Exit
Facility is the very gravamen of its complaint.") (emphasis in original).

[51]    *IMG Fragrance*, 679 F. Supp. 2d at 405-06 (quoting *Lama Holding Co. v. Smith Barney Inc. et. al.*,
88 N.Y.2d 413, 424 (1996)); *see also Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006);
*Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 466, 480 (S.D.N.Y. 2011) ("***Howe***"); *White Plains Coat &
Apron Co., Inc. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007) ("***White Plains Coat***").

parties mutual assent and mutual intent to be bound."[52]  In the most common situation, all parties

to the contract execute the same document.  But that is not the only way by which a contract can

be formed.  Under familiar principles, a contract may also be created by, *inter alia*, separate

communications that together evidence an offer and acceptance.  But here the Court cannot find

a contract on that basis either.

Back at the time when the Court considered the Plan Enforcement Motion, the Court

noted, in oral argument[53] and in its decision,[54] Highland's failure to articulate what was the offer

and acceptance of the contract with which UBS allegedly interfered.  Back then, the Court had

difficulty ascertaining whether Highland was alleging that the Information Memorandum was the

offer, and the Commitment Letter was the acceptance, or was alleging that the Commitment

Letter was the offer, and the Responsive E-mail was the acceptance.[55]  Highland thereafter

ceased prosecution of its state court complaint against Lyondell and UBS, and commenced this

adversary proceeding instead—now against UBS alone.  But it took no steps to clarify its

allegations in this regard.

---

[52]     *City of New York v. N.Y. Pizzeria Delicatessen, Inc.*, 2006 U.S. Dist. LEXIS 71414, at *18, 2006 WL
2850237, at *5 (S.D.N.Y. Sept. 29, 2006) (Karas, J.) (quoting *Sel-Leb Marketing, Inc. v. Dial Corp.*, 2002
U.S. Dist. LEXIS 15932, at *11, 2002 WL 1974056, at *4 (S.D.N.Y. Aug. 27, 2002) (Stein, J.)).

[53]     *See* Plan Enforcement Motion Hrg. Tr. at 35, 38 (Highland's recitation of the documents that made up the
contract Highland alleged to exist was "very, very vague").  Highland responded by submission of a
supplement which simply included the Information Memorandum, the Terms Summary, the e-mail
communications discussed above, and the executed Term Loan Agreement.  *See* 12(b)(6) Motion Exh. C
("**Highland Response**").  But Highland still did not specify which of these constituted the offer, and which
constituted the acceptance.  And the Term Loan Agreement was, without dispute, an agreement to which
Highland was *not* a party; Highland's inability to enter into the Term Loan Agreement was the gravamen of
its complaint.

[54]     *See Plan Enforcement Decision*, 445 B.R. at 290.

[55]     *See id.* at 290 n.32 ("Complaint ¶ 16 refers to the Memorandum as the offer, but Complaint ¶ 18 refers to
Lyondell as having 'accepted' Highland's offer in its Commitment Letter.").  It was clear, however, that
Highland was not then alleging that the Term Loan Agreement constituted the contract with which UBS
allegedly interfered, *see id.* at 290, and that is equally clear now.

-13-

Here, once again, Highland alleges variously that the Information Memorandum

constituted the alleged offer[56] (and that its Commitment Letter constituted the acceptance), and

that its Commitment Letter constituted the alleged offer and the Responsive E-mail constituted

the acceptance.[57]  The Court can subscribe to neither theory, nor, especially, to the notion that the

exchange of this correspondence bound either side to deal with the other in a $1 billion financing

(or a $150 million piece of a $1 billion financing)—either as a definitive contract or, as the law

also permits, a preliminary agreement obligating the parties to negotiate in good faith to enter

into a later definitive agreement.

### 1. *Theory That Commitment Letter Was Acceptance*

Turning first to Highland's first theory—that the Information Memorandum was the

offer, and the Commitment Letter was the acceptance—the documents incorporated as part of the

Complaint belie that contention.[58]  The Information Memorandum—whose full name was

"Confidential Information Memorandum for Public Investors"—was just that.  It was a

---

[56]    *See* Cmplt. ¶ 8 (alleging that Information Memorandum "offered participation" in the Term Loan "on the terms memorialized" in the Information Memorandum); *id.* ¶¶ 11-12 (alleging that Information Memorandum "outlined the material term" of the Term Loan, and "specified the manner in which Lyondell's offer could be accepted"); *id.* ¶ 15 (alleging that Highland received the "offer" made in the Information Memorandum).

[57]    *See* Cmplt. ¶ 17 (on the same day Highland sent in the Commitment Letter, Lyondell "accepted the commitment").

[58]    The Court disagrees with Highland's contention that the existence of a contract is "quintessentially a fact issue" that cannot be addressed on a motion to dismiss.  When the documents characterized in the complaint permit only one conclusion, the Court can reach that conclusion as a matter of law.  *See, e.g.*, *In re 50 Pine Co., LLC*, 317 B.R. 276, 283 (Bankr. S.D.N.Y. 2004); *Spencer Trask Software & Info. Serv. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 439 (S.D.N.Y. 2003); *Advanced Marine Techs. Inc. v. Burnham Sec., Inc.*, 16 F. Supp. 2d 375, 381 (S.D.N.Y. 1998); *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 70 A.D. 3d 423, 427 (1st Dep't 2010) ("*Amcan*"); *Jordan Panel Sys., Corp. v. Turner Constr. Co.*, 45 A.D.3d 165, 173 (1st Dep't 2007); *see also Keis Distribs. v. Northern Distrib. Co.*, 226 A.D.2d 967, 968 (3d Dep't 1996) ("*Keis*") ("There can be no contract absent a mutual intent to be bound. The question of intent is for the court to decide as a matter of law if the language employed is unambiguous.") (citations omitted).

disclosure document, relating to both the Term Loan and a separate Asset Based Loan facility,

and provided expressly that it was "solely for informational purposes."[59]

A *portion* of the Information Memorandum—captioned "Notice to and Undertaking by

Recipients" (the "**Recipient's Undertaking**")—spoke in terms of creating a contract. The

Recipient's Undertaking addressed the confidential information contained in the Information

Memorandum. The Recipient's Undertaking—which had a lead-in (from which language

described in n. 59 was taken), and then sections on confidentiality obligations (Section I),

disclaimers as to the information provided (Section II), and general provisions relating to the

Recipient's Undertaking (Section III)—stated, at the end of the lead-in:

> Acceptance of this Confidential Information Memorandum
> *constitutes an agreement* to be bound by the terms of this
> Notice and Undertaking and the Special Notice set forth on
> the Cover Page hereof.[[60]] If the recipient is not willing to
> accept the Confidential Information Memorandum and
> other evaluation material … on the terms set forth in this
> Notice and Undertaking and the Special Notice, it must
> return the Confidential Memorandum and any other
> evaluation material to the Arrangers immediately….[61]

This, of course, would create an enforceable agreement. But there was no comparable language

elsewhere in the Information Memorandum that would do likewise.

To the contrary, Section III ("General") of the Notice and Undertaking expressly stated:

---

[59]    *See* Information Memorandum, Highland Response Exh. 1A, Notice to and Undertaking by Recipients, third page. It continued that the Information Memorandum was provided by BofA and UBS, as the arrangers of the Term Loan, and Citigroup Global Markets and Deutsche Bank Securities, as the arrangers of the ABL Facility, "to you in your capacity as a prospective lender," "in considering the proposed [Term Loan] and [ABL Facility] described in the Confidential Information Memorandum." *Id.*

[60]    That Special Notice, whose full name was "Special Notice Regarding Publicly Available Information," addressed the circumstance that the Information Memorandum contained information that was publicly available, but that if the recipient communicated with contacts the Information Memorandum identified, the recipient would have to assume the risk that the recipient might receive non-public information, and then be subject to trading restrictions imposed by the federal and state securities laws. *See* Information Memorandum, second page.

[61]    Information Memorandum, Notice to and Undertaking by Recipients, third page (emphasis added; capitalization of the entirety of that paragraph changed to normal capitalization for readability).

> It is understood that unless and until a definitive agreement
> regarding the Facility between the parties thereto has been
> executed, the Recipient will be under no legal obligation of
> any kind whatsoever with respect to the Facility by virtue of
> this Notice and Undertaking except for the matters
> specifically agreed to herein and in the Special Notice.[62]

And it further stated:

> This Notice and Undertaking and the Special Notice
> together embody the entire understanding and agreement
> between the Recipient and the Arrangers with respect to
> the Evaluation Material and the Internal Evaluation
> Material and supersedes all prior understandings and
> agreements relating thereto.  The terms and conditions of
> this Notice and Undertaking and the Special Notice shall
> apply until such time, if any, that the Recipient becomes a
> party to the definitive agreements regarding the Facility,
> and thereafter the provisions of such definitive agreements
> relating to confidentiality shall govern.[63]

These provisions demonstrate the ability of those drafting the Information Memorandum to

speak in terms of contractual import when they wanted to.  They also demonstrate the limited

extent to which the drafters chose to do so.

Other than as quoted, the Information Memorandum did not speak in contractual terms.

It did not say that it was an offer, or otherwise purport to be one.  And except with respect to the

confidentiality and securities laws issues that were addressed in the Recipient's Undertaking, and

the fact that entities electing to lend would later enter into "definitive agreements regarding the

Facility," the Information Memorandum did not speak in terms of the Information Memorandum

resulting in any agreement, much less did it say (as did the leading case in this area, *Teachers*

*Insurance & Annuity Association of America v. Tribune*,[64] and others finding and enforcing

---

[62]      *Id.*, fourth page.

[63]      *Id.*, fifth page.

[64]      670 F. Supp. 491, 494 (S.D.N.Y. 1987) ("***Tribune***") (Leval, J., then a district judge).

-16-

preliminary agreements[65]) that it was (or would result in) a binding agreement before the lenders signed and executed the Term Loan Agreement.  It did not say, or otherwise manifest an intent, that Lyondell would be bound to borrow from anyone returning a commitment letter.

Further, the Information Memorandum made clear that the lenders providing funds under the Term Loan would be chosen later, and that the amounts any might lend would be determined later as well.  The Terms Summary defined Lenders as "[f]inancial entities or entities acceptable to the Joint Lead Arrangers,"[66] and the Engagement Letter (which the Court properly may consider, for reasons discussed above) gave UBS the right to decide "which institutions will participate."[67]  Highland's Commitment Letter confirmed this, stating expressly that "[w]e understand that allocations will be made at the discretion of the Company and you."[68]

Similarly, the Commitment Letter acknowledged,[69] as the Information Memorandum had stated,[70] that allocations to any lenders ultimately chosen to participate would be subject to the discretion of UBS and Lyondell.  And—again consistent with the Information Memorandum, which called for the inclusion of such language in responses—Highland stated that its commitment was "subject … to satisfactory documentation."[71]

---

[65] *See Teachers Ins. & Annuity Ass'n of Am. v. Butler,* 626 F. Supp. 1229, 1230 (S.D.N.Y. 1986) (Weinfeld, J.) (parties acknowledged that the commitment letter "constituted a binding agreement between them"); *Teachers Ins. & Annuity Ass'n of Am. v. Ormesa Geothermal,* 791 F. Supp. 401, 414 (S.D.N.Y. 1991) (Wood, C.J.) ("Here the Commitment Agreement expressly said it was a 'binding agreement'….").

[66] Information Memorandum Exh. 1B, Summary of Principal Terms and Conditions.

[67] 12(b)(6) Motion Exh. B, at 4.

[68] Commitment Letter, Highland Response Exh. 2, third page.

[69] *See id.* ("We understand that allocations will be made at the discretion of the Company [Lyondell] and you.").

[70] See Information Memorandum, seventh page.

[71] *See* Commitment Letter ("Subject only to satisfactory documentation, on behalf of our advised funds and accounts we are pleased to commit:  $150 million to the $1.0 billion Senior Secured Term Loan Facility ('the Term Loan')").

These facts, juxtaposed against the applicable caselaw, require the Court to find that the Information Memorandum did not constitute an offer which, upon acceptance, would lead to a binding agreement. An offer must be definite and certain, rather than simply informational or exploratory.[72] In this case the Information Memorandum was definite and certain with respect to the Recipient's Undertaking with respect to information the Information Memorandum contained (and other matter relating to compliance with securities laws), but was merely "informational and exploratory" in all other respects. And it did not purport to give rise to contractual obligations with respect to anything else. Indeed, the express statement in the Information Memorandum that it was "solely for informational purposes" precludes the Court from finding that it had other purposes—most significantly, of binding Lyondell to contractual relations with any who responded.

Quite apart from the failure of the Information Memorandum to speak in terms of offer and acceptance, or to otherwise create contractual obligations other than with respect to confidentiality, the repeated references in the Information Memorandum to the future definitive documentation that later would need to be executed, and Highland's statement, in the Commitment Letter, that Highland's commitment was "subject to" the execution of definitive documentation, strongly compel a conclusion that binding contractual relations did not come into being before definitive documentation was drafted and executed.

"A primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they never intended."[73] In this connection, "[t]here is a strong

---

[72]    *Keis*, 226 A.D.2d at 969 (citing *Concilla v. May*, 214 A.D.2d 848, 849-50 (3d Dep't 1995)).

[73]    *Tribune*, 670 F.Supp. at 497. Likewise, as Judge Leval stated thereafter:

> More is needed than agreement on each detail, which is overall
> agreement (or offer and acceptance) to enter into the binding contract.
> Nor is this principle altered by the fact that negotiating parties may
> have entered into letters of intent or preliminary agreements if those

presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents."[74]  When definitive documentation is contemplated, language in an interim agreement stating that the interim agreement nevertheless is a "binding agreement" (or similarly expressing the parties' intention to be bound by an interim agreement before the definitive documentation is executed) can overcome this presumption, as it did in *Tribune*.  But here, except with respect to confidentiality (which stands in dramatic contrast to the remainder of the document), there was no language in the Information Memorandum providing that it would be a binding agreement (or form part of one), or otherwise evidencing an intention then to be bound before the execution of definitive documentation.  Here factors identified by Judge Leval in *Tribune*—open  terms inherent in a $1 billion financing; the need for future approvals by UBS and Lyondell; and Highland's own recognition that its commitment was "subject to satisfactory documentation"—*support application* of the presumption, rather than overcome it.

Indeed, in nearly all if not all of the cases involving agreements that are asserted to be binding before definitive documentation is executed have involved a single document that both sides of an asserted contract signed, and where the court *still* did not find an enforceable contract.[75]  Here, of course, that is not even the case, and the alleged contract must be pieced

---

were made with the understanding that neither side would be bound until final agreement was reached.  The Court of Appeals in several recent cases has stressed the importance of recognizing the freedom of negotiating parties from binding obligations, notwithstanding their having entered into various forms of non-binding preliminary assent.

*Id.*

[74]   *Id.* at 499.

[75]   *See, e.g., Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262 (2d Cir.), *cert. denied*, 469 U.S. 828 (1984) ("agreement in principle" was not a binding agreement; documents and testimony showed intent of both parties not to be bound prior to execution of formal, written contract); *Adjustrite Sys. v. GAB Bus. Servs.*, 145 F.3d 543, 550 (2d Cir. 1998) (no binding agreement; document was expressly contingent upon execution of future formal agreement); *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d

together from diverse documents to form the contract that is alleged to exist.  Facts of that

character may not *always* preclude a finding of a binding agreement, but they make it even more

difficult to overcome the presumption.  Here the presumption stands.[76]

Strongly supporting that conclusion, in this Court's view, is the recent decision of New

York's Appellate Division, First Department, in *Amcan*.[77]  There the terms of a loan facility were

summarized in a document similar to the Terms Summary here.[78]  The summary of the facility's

terms, which were negotiated between lender and borrower, contained specifics on a number of

items, including, among others, detailed descriptions of the credit lines, the amount of funding to

be provided under each, amortization and interest rates, fees, security, a proposed closing date,

and definitions of key terms.[79]  With language quite similar to that here, the summary of terms

stated:

> The Credit Facilities will only be established upon
> completion of definitive loan documentation, including a
> credit agreement . . . which will contain the terms and
> conditions set out in this Summary in addition to such other
> representations . . . and other terms and conditions . . . as
> [the defendants] may reasonably require.[80]

---

Cir. 1989) ("**Arcadian Phosphates**") (no binding agreement; memorandum describing prospective sale had language indicating that prospective seller did not intend to be bound).

[76]  *See Arcadian Phosphates,* 884 F.2d at 73 ("In *Tribune*, the language of the agreement argued persuasively for overcoming this presumption; here, the language of the agreement argues persuasively for letting the presumption stand.").

[77]  *See* n.58 above.

[78]  70 A.D.3d at 424.

[79]  *Id.*

[80]  *Id.*  Similarly, under the subheading "Conditions Precedent" were included what was "[u]sual and customary for transactions of this type," such as—for "Initial Funding," the "[e]xecution and delivery of an acceptable formal loan agreement and security . . . documentation, which embodies the terms and conditions contained in this Summary."  *Id.* at 425.

After the defendant lenders broke off negotiations, the deal was never consummated. Plaintiffs sued for breach of contract based on defendants' failure to close the loan, breach of defendants' obligation of good faith and fair dealing, and fraud.

The First Department in *Amcan* ruled that when the Draft Summary and Summary documents clearly stated that the credit facilities "will only be established upon completion of definitive loan documentation," which would contain not only the terms and conditions in those documents but also such "other terms and conditions ... as CIBC may reasonably require," the summary of terms and conditions was not a binding agreement:

> Although the Summary was detailed in its terms, it was clearly dependent on a future definitive agreement, including a credit agreement. At no point did the parties explicitly state that they intended to be bound by the summary pending the final credit agreement, nor did they waive the finalization of such agreement.[81]

Ruling that the motion to dismiss the complaint should have been granted in its entirety, the *Amcan* court explained: "The fact that the summary was extensive and contained specific information regarding many of the terms to be contained in the ultimate loan documents and credit agreements does not change the fact that defendants clearly expressed an intent not to be bound until those documents were actually executed."[82] *Amcan* strongly supports the conclusion the Court reaches here.

The facts here are readily distinguishable from the facts in *Tribune*, where, even though the commitment letter was conditioned upon the execution of satisfactory documents, it expressly stated that receipt of an accepted counterpart of the commitment letter would create "a

---

[81]   *Id.* at 426.

[82]   *Id.* at 427.

binding agreement."[83]   Here, unlike *Tribune*, there is no "binding agreement" language or any other language that could reasonably be construed to bind the parties.

Similarly, Highland's reliance on *Lazard Freres & Co. v. Protective Life Insurance Co.*[84] is misplaced.  *Lazard* involved allegations of fraud with respect to oral representations concerning what a document (called a "Scheme Report") might say, when the buyer had the actual document for six days without reading it by the time it signed a confirmation of the purchase.[85]   That case merely turned on whether, in light of financial community custom in the trading of bank debt, an oral agreement was entered into for the purchase of that debt before the written confirmation, and whether the signing of the written confirmation was merely a ministerial act to acknowledge the previously binding oral agreement or represented the agreement itself.[86]   Here, by contrast, there are no similar allegations of an earlier agreement, or of anything in writing that could support an argument that any earlier binding agreement had come into being.

Historically, and even to this day, the bulk of the caselaw on interim agreements (and alleged interim agreements) under New York law has emerged from the federal courts.  In

---

[83]     *Tribune*, 670 F. Supp. at 494.

[84]     108 F.3d 1531 (2d Cir. 1997).

[85]     *See id.* at 1535.

[86]     *Id.* at 1537-38.  The court explained:

> The question is rather the time when due diligence was expected to take place, and the time when the agreement became binding subject to that due diligence.  Was Protective expected to check the documents (including the Scheme Report) before binding itself to purchase the debt by signing the Written Confirmation, or was the signing of the Written Confirmation merely a ministerial act to acknowledge the previously binding oral agreement, under which Protective had the right to perform some due diligence (by reviewing the documentation) at any time prior to the formal closing?  This is precisely the question of fact that Protective disputes….

*Id.* at 1537.

*Tribune,* Judge Leval observed that preliminary contracts with binding force could "be of at least two distinct types"[87]—one where the parties reached "complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation"[88] (even though further definitive documentation would later be executed), and another where the agreement is more skeletal (involving "mutual commitment to a contract on agreed major terms,"[89] requiring negotiation in good faith to agree on other terms and to reach final agreement).  Thereafter, many federal cases adopted his distinctions, referring to agreements of the two types that he described as "Type I" and "Type II" interim agreements.[90]

In 2009, however, the New York Court of Appeals stated that while it did not disagree with the reasoning in *Tribune*, it did not find the "rigid classifications into 'types' useful"—stating instead that in determining whether the document in a given case is an enforceable contract or not, the question should be asked in terms of "whether the agreement contemplated the negotiation of later agreements and if the consummation of those agreements was a precondition to a party's performance."[91]

Here that is easy to answer.  The negotiation and consummation of later agreements was expressly contemplated; communications were "subject to" the execution of those documents; and execution of those documents (along with other contingencies, such as UBS' selection of Highland as a lender) was a precondition to Highland's and Lyondell's obligations, and there was no language, as in *Tribune*, evidencing an intent to be bound before that time.

---

[87]    670 F. Supp. at 498.

[88]    *Id.*

[89]    *Id.*

[90]    *See, e.g., Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005).

[91]    *IDT Corp. v. Tyco Group, S.A.R.L.*, 13 N.Y.3d 209, 213 n.2 (2009) ("**IDT**"); *accord Amcan*, 70 A.D.3d at 427 (quoting *IDT*).

There was no enforceable contract here.

*2. Theory That Commitment Letter was Offer*

Turning then to Highland's second theory—that the Commitment Letter was the offer, and the Responsive E-Mail was the acceptance—the Court is equally unpersuaded by that contention.

Deficiencies previously noted apply to this theory as well. The Commitment Letter stated expressly that it was subject to satisfactory documentation. The Commitment Letter acknowledged that any allocation of the Term Loan to Highland would be subject to the discretion of Lyondell and UBS. Material terms with respect to whether Highland would receive any allocation, and the size of such if Highland were to get any, were never agreed to.

Then, assuming, *arguendo*, that the Commitment Letter was an offer, the Court cannot find an acceptance. The Responsive E-mail was merely an acknowledgment of receipt. It did not say that it was an acceptance, or otherwise say that a contract was then being formed. New York courts have held that form acknowledgments of receipt do not constitute an acceptance of an offer; there must be something more, indicating an intent to form a binding contract.[92]

Thus this theory must be rejected as well.

---

[92]     *See Thome v. Alexander & Louisa Calder Foundation*, 70 A.D.3d 88, 95, 104 (1st Dep't 2009) (Though a foundation that authenticated Calder's art posted an invitation to the public on its website to submit applications for possible inclusion of artwork in a catalogue of authenticated works, called a "catalogue raisonné," that did not constitute an offer that the plaintiff could accept by performance. And the Foundation's postcard acknowledging that it had received his materials, and stating that it had "everything necessary to consider these works for inclusion in the catalogue raisonné," did not constitute the acceptance of an offer that the plaintiff had made. "[T]he form acknowledgment sent by the Foundation to plaintiff, informing him that the Foundation received his submission, does not contain any language indicating, or reinforcing, any intent to form a binding contract."); *Van Keuren v. Boomer & Boschert Press Co.*, 143 A.D. 785 (3d Dep't 1911) (a postcard sent by the manufacturer to the purchaser, upon receipt of the order, which read "your order … received … and will have our best attention" did not constitute an acceptance of the order so as to make him liable to the purchaser for a refusal to ship the goods on the terms of the order).

-24-

B.      *Interference with Prospective Economic Relations*

Highland's second claim for relief, sometimes referred to as "tortious interference with

business relations," asserts that UBS tortiously interfered with Highland's entry into a

*prospective* contract.  To state a claim for tortious interference with business relations, a plaintiff

must allege that (1) it had a business relationship with a third party; (2) the defendant knew of

that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice

(i.e., with the sole purpose of harming the plaintiff), or used dishonest, unfair, or improper

means; and (4) the defendant's interference caused injury to the relationship.[93]

Apart from any defenses UBS might assert later, if necessary, UBS asserts two defenses

of absolute privilege now.  The first rests on UBS' contention that it was free to act in the

manner at issue because such was in its economic interest.  The second rests on UBS' contention

that it had the right to decide with whom it would deal.  While the first defense requires too

much in the way of extrinsic proof to decide now on a motion under 12(b)(6), the second defense

may be considered now, and this defense requires dismissal.

1.  *Privilege to Act in One's Economic Interest*

The economic interest defense arises where the defendant acted to protect its own legal or

financial stake in the business of the entity with whom the plaintiff might otherwise have had an

economic relationship.[94]  The economic interest can include that of the defendant's interests as

well even where the defendant does not have an ownership interest in the breaching party's

business.[95]  "The defense has been applied, for example, where defendants were significant

stockholders in the breaching party's business; where defendant and the breaching party had a

---

[93]     *See, e.g.*, *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012); *Goldhirsh Group v. Alpert*, 107 F.3d 105, 108-09 (2d Cir. 1997); *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994).

[94]     *Howe*, 783 F. Supp. 2d at 481; *White Plains Coat*, 8 N.Y.3d at 426.

[95]     *Howe*, 783 F. Supp. 2d at 482.

parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff."[96]

When the economic interest defense is established, it can be defeated only by a showing of malice.

On the face of the Complaint, Highland alleges that UBS was a party to the Term Loan and that UBS had a business relationship with Lyondell.  For instance, Highland alleges that UBS was "Lyondell's New York agent arranging" the Term Loan,[97] UBS prepared and delivered the Information Memorandum to Highland,[98] UBS was designated to receive acceptance letters such as the Commitment Letter,[99] and UBS had discretion to make allocations of the Term Loan.[100]  These allegations suggest the potential viability of the economic interest defense, but UBS would still have to flesh out the facts and show, in some way, that it was in UBS' economic interest to leave Highland out of the financing.

Similarly, the economic interest defense can be defeated if Highland can show that UBS acted with malice, and Highland makes just such an allegation.  In fact, the Complaint is peppered with the words "malice" and "maliciously."  And Highland alleges that UBS acted with the "sole purpose of harming Highland or by means that are dishonest, unfair, or otherwise improper."[101]

---

[96]   *White Plains Coat*, 8 N.Y.3d at 426 (citations omitted); *accord Howe*, 783 F. Supp. 2d at 481-82 (citing similar situations in which the defense applies).

[97]   Cmplt. ¶¶ 1, 22.

[98]   *Id.* ¶ 22.

[99]   *Id.*

[100]   *Id.* ¶¶ 14, 22.

[101]   *Id.* ¶ 41.

In response, UBS notes, appropriately, that under recent U.S. Supreme Court precedent, mere labels and conclusions will not do.[102] And Highland goes on to argue that Highland's claims of malice are merely conclusory, and are unsupported by sufficient underlying factual allegations to suggest that UBS did anything illegal or improper, or with the sole purpose of harming Highland.

The Court cannot agree with UBS as to this at the 12(b)(6) stage. Upon review of the Complaint—and with reference to the five separate lawsuits filed between UBS on the one hand, and Highland, on the other—it is easy to infer that at least some personnel at UBS and Highland dislike one another, or worse. And Highland alleges the evidentiary fact that UBS "brazenly admitted that it refused to provide any allocation to Highland because of the UBS/Highland litigation."[103]

It does not follow from that, of course, that UBS acted intentionally to harm Highland solely by reason of anyone's dislike or distrust, but the Court cannot find such a conclusion to be wholly implausible. Though *aspects* of Highland's claims in this regard are wholly implausible,[104] the Court is not now in a position to conclude, on a 12(b)(6), that they *all* are.

### 2. *Privilege Not to Do Business*

UBS' second defense rests on an absolute privilege to choose with whom it will do business. With respect to this defense, motivations (including malice) are irrelevant.[105] In fact,

---

[102]    *Twombly*, 550 U.S. at 555.

[103]    Cmplt. ¶ 28.

[104]    For example, without alleging more in substantiating facts, Highland alleges that UBS intended to "embarrass Highland and diminish its standing in the financial community" by refusing to allocate the Term Loans. Cmplt. ¶ 26. But Highland does not allege how Highland's exclusion from the Term Loan Agreement would have been made public absent Highland bringing suit against UBS as Highland did in New York state court and then this Court.

[105]    Highland cites a case (though only one) for the proposition that allegations of malice can overcome this privilege, *see Delphi Industries, Inc. v. Stroh Brewery Co.*, 1993 U.S. Dist. LEXIS 17166, at *49-50, 1993 WL 502360, at *18 (N.D. Ill. Dec. 3, 1993) ("***Delphi Industries***") (citing Illinois case for that

under New York law, at least, the privilege not to deal "exists regardless of the actor's motive for refusing to enter business relations with the other and even though the sole motive is a desire to harm the other."[106]

> It is the well-settled law of this State that the refusal to maintain trade relations with any individual is an inherent right which every person may exercise lawfully, for reasons he deems sufficient or for no reasons whatever, and it is immaterial whether such refusal is based upon reason or is the result of mere caprice, prejudice or malice.[107]

This privilege not to do business has been recognized in tortious interference cases where the refusal to do business followed a prior dispute or litigation.[108]

The First Department's decision in *Turner Construction,* dismissing a claim for "[i]nterference with pre-contractual relations," is closely on point.  There Seaboard Surety asserted tortious interference claims against Turner Construction, a general contractor, for Turner Construction's telling its subcontractors that performance bonds issued by Seaboard Surety would be unacceptable to Turner Construction, and that they should not deal with Seaboard Surety on Turner Construction jobs—following a dispute between Turner Construction and Seaboard Surety with respect to another project.[109]  This had the effect of causing Turner Construction's subcontractors to stop purchasing performance bonds from Seaboard Surety for

---

proposition), but the case cited by Highland relies upon Illinois state law for such proposition, and New York law applies to this dispute.

[106]    *Turner Constr. Co. v. Seaboard Surety Co.*, 98 A.D.2d 88, 90-91 (1st Dep't 1983) ("***Turner Construction***") (quoting Restatement, Torts § 762 Comment c.).

[107]    *Turner Construction*, 98 A.D.2d at 90 (quoting *Locker v. American Tobacco Co.*, 121 A.D. 443, 451-52 (2d Dep't 1907) ("***Locker***"), *aff'd on opinions below*, 195 N.Y. 565 (1909).

[108]    *See Turner Construction*, 98 A.D.2d at 89; *Delphi Industries,* 1993 U.S. Dist. LEXIS 17166, at *48, 1993 WL 502360, at *18 (citing cases under New York law, including *Turner Construction*); *Quintana v. First Interstate Bank of Albuquerque*, 105 N.M. 784, 787 (N.M. Ct. App. 1987) ("The Bank's privilege to refuse to do business with plaintiffs existed regardless of the motive for its decision.  The fact that the Bank may have denied consent because of the earlier lawsuit is immaterial.") (citing *Turner Construction*, 98 A.D.2d at 88).

[109]    *Turner Construction*, 98 A.D.2d at 89.

projects in which Turner Construction was involved.[110]  Nevertheless, for the reasons noted

above, the First Department dismissed Seaboard Surety's claims against Turner Construction,

finding that Turner Construction acted within its legal rights.[111]

Claims of malice did not change the result.  As the *Turner Construction* court stated:

> Finally, the pleading is not helped by such conclusory
> allegations as, "The sole purpose of Turner's actions was to
> cause damage and irreparable harm to Seaboard."
> Particularly is this true as it appears from Seaboard's own
> pleading that Turner was motivated by its unsatisfactory
> experience with Seaboard in connection with the IBM
> Burmar performance bond.[112]

By reason of UBS' privilege not to deal with Highland, even when it was alleged that

UBS did so out of malice and when it caused *Lyondell* not to deal with Hyland as well,

Highland's claim for tortious interference with prospective economic must fail.

<u>Conclusion</u>

For the reasons set forth above, Highland's Complaint is dismissed.  There is no

justification for granting leave to amend, given the long history of this dispute and its prior

iterations,[113] and what the underlying documents say.  The Court is today entering an order

granting UBS' motion under Fed.R.Civ.P. 12(b)(6), and, pursuant to Fed.R.Civ.P. 58 (made

applicable to this adversary proceeding by Fed.R.Bankr.P. 7058), a separate standalone judgment

denying the relief sought by Highland in its Complaint.

Dated: New York, New York　　　　　　　 **_s/Robert E. Gerber_**
　　　　April 10, 2013　　　　　　　　　United States Bankruptcy Judge

---

[110]　　*Id.* at 91.

[111]　　*Id.* at 89.

[112]　　*Id.* at 91-92 (citation omitted).

[113]　　*See Plan Enforcement Decision,* cited in Cmplt. ¶ 2, 445 B.R. at 278, 285.